FILED

November 21, 2017

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time 9:37 AM



# TENNESSEE BUREAU OF WORKERS' COMPENSATION CLAIMS
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT MURFREESBORO

| | | |
|---|---|---|
| **SHAWN OGDEN,** | ) | **Docket No. 2016-05-1093** |
| **Employee,** | ) | |
| **v.** | ) | |
| | ) | |
| **McMINNVILLE TOOL & DIE, INC.,** | ) | **State File No. 11323-2015** |
| **Employer,** | ) | |
| **And** | ) | |
| | ) | |
| **FEDERATED MUT. INS. CO.,** | ) | **Judge Dale Tipps** |
| **Carrier.** | ) | |

---

## COMPENSATION HEARING ORDER

---

This matter came before the undersigned Workers' Compensation Judge on November 2, 2017, for a Compensation Hearing. The central legal issue is whether Mr. Ogden's October 1, 2016 fall was a direct and natural result of his compensable injury or whether it was the result of an independent, intervening cause. For the reasons set forth below, the Court holds that Mr. Ogden established by a preponderance of the evidence that his October 1 fall is compensable. Accordingly, the Court concludes Mr. Ogden is entitled to medical benefits and permanent total disability benefits for the injuries arising out of that fall.

### History of Claim

*Stipulations*

The parties stipulated to the following: Mr. Ogden suffered a compensable injury to his right arm at McMinnville Tool & Die, Inc. (MTD) in February 2015. He subsequently developed complex regional pain syndrome (CRPS) in the injured arm. MTD accepted that condition as compensable and provided benefits. Dr. Jeffrey Hazlewood assigned Mr. Ogden a 15% permanent impairment rating to the body as a result of the February accident. MTD is responsible for providing future treatment for the CRPS pursuant to Tennessee Code Annotated section 50-6-204.

1

Although MTD disputed the compensability of Mr. Ogden's subsequent fall on October 1, it has provided medical care from February 1, 2017, through the present, including Mr. Ogden's continuing inpatient treatment at the Shepard Center in Atlanta. The parties agree there is a gap in medical benefits from October 1 through February 1, but MTD stipulated that in the event the accident is determined to be compensable, it would be responsible for paying for all related medical care under the Tennessee Workers' Compensation Medical Fee Schedule.

MTD has paid all temporary disability benefits to which Mr. Odgen is entitled and continues to pay weekly benefits at the stipulated compensation rate of $290.80.

Finally, the parties agreed that, if the Court finds the October 1 accident compensable, Mr. Ogden is permanently and totally disabled.

*Shawn Ogden*

Mr. Ogden submitted a written statement and testified at trial.[1]  Because of the severity of his CRPS, he elected to undergo implantation of a spinal cord stimulator. Dr. Hung Yu surgically implanted this device in Mr. Ogden's cervical spine on August 31, 2016. After a couple of weeks of recovery in his bed at home, Mr. Ogden began walking around his house and doing some light chores, such as loading the dishwasher and sweeping.

On at least one occasion, Mr. Ogden's right leg gave way while he was walking inside his house, causing him to fall against the washing machine. He told his doctors he was having some problems walking and requested a cane, which he never received. Mr. Ogden was supposed to begin physical therapy, but had not yet begun it at the time of his October 1 fall.

While he recuperated, Mr. Ogden spent some part of each day in his garage where he kept a chair and television. One reason for this was that he smoked cigarettes but did not smoke in the house. Until October 1, he never had any difficulties navigating the three stair steps into the garage, which he did several times per day. Mr. Ogden was unable to use the railing when descending because it was on the same side as his injured right hand.

Mr. Ogden was home alone on the evening of October 1. He went about his normal activities, including a few trips to the garage. As the evening progressed, Mr. Ogden began suffering increased pain in his neck. It became so severe that he decided to

---

[1] Mr. Ogden participated in the hearing by telephone. Although the written statement was unsigned, the parties stipulated to its admissibility.

call his girlfriend, Misty Gibson, to ask her to come home from work. He went to get his cell phone from the garage.

When Mr. Ogden got to the bottom step in the garage, his right leg gave way, causing him to fall. He vehemently denied ever passing out or losing consciousness. When Mr. Ogden fell, he landed on the step on his buttocks, and his head hit the wall next to the steps. He crawled to get the phone and took it back into the house. Once inside, Mr. Ogden tried to stand up but fell down again onto his backside. He managed to get into a chair and call Ms. Gibson. She called 9-1-1 when she got home, and the EMTs arrived soon after.

Mr. Ogden told the EMTs that he fell and could not walk. He did not tell them he passed out. They transported him to Unity Medical Center. He did not recall any hospital personnel interviewing him, but they gave him medication and eventually sent for a helicopter to transport him to Vanderbilt Medical Center. He told the aircrew he fell but did not tell them he passed out or lost consciousness. Once Mr. Ogden arrived at Vanderbilt, a neurosurgeon performed surgery to remove the spinal cord stimulator.

On cross-examination, Mr. Ogden admitted he became more unstable on his feet over time and his knee would sometimes "give out." At the time he requested the cane on September 9, these episodes occurred approximately once per week.

*Misty Gibson*

Misty Gibson lived with Mr. Ogden, accompanied him on his medical appointments, and helped him comply with the doctors' instructions and prescriptions. Following the surgery, Mr. Ogden would move about the house, going to the sunroom to let the dogs out or to the garage to smoke.

On October 1, Mr. Ogden called and told Ms. Gibson he had fallen. When she got home, Ms. Gibson found Mr. Ogden sitting in a chair and unable to hold his head up or move his legs. When the EMTs arrived, Ms. Gibson heard Mr. Ogden tell them he had not passed out or lost consciousness. After Mr. Ogden arrived at Unity Medical Center Ms. Gibson described Mr. Ogden as "loopy" and "out of it," perhaps because of the pain medicine he received there.

*Tammy Lehman*

Tammy Lehman was Mr. Ogden's Nurse Case Manager. She confirmed Mr. Ogden complained of leg weakness and unsteadiness after the spinal cord stimulator and requested a cane. Ms. Lehman was unaware of any specific physical limitations imposed on Mr. Ogden by his doctors at the time of his fall.

3

*Kristen Smith*

Kristen Smith was the flight nurse who took care of Mr. Ogden on his helicopter flight to Vanderbilt. She took a history directly from Mr. Ogden and noted he "sustained syncopal episodes x2 tonight at home in which he fell down a set of stairs . . . His family states immediately after the fall, he regained consciousness but was paralyzed from the waist down. Family and patient states this paralysis has never happened before tonight." Ms. Smith denied copying this information from another source and said she took this history directly from Mr. Ogden and his girlfriend. She also testified Mr. Ogden was alert and oriented when she talked to him.[2]

*Hung Yu, M.D.*

Dr. Yu performed Mr. Ogden's spinal cord stimulator implant surgery and treated him after his October 1 fall. She acknowledged Mr. Ogden's cardiac history and said his ongoing heart failure could prompt dizzy spells, shortness of breath, and difficulty with motor skills. However, Dr. Yu stated in her affidavit, "there is no medical evidence indicating a syncope episode contributed to [his] falls." Instead, she wrote:

> It is my opinion Mr. Ogden's falls of October 1, 2016, resulted from the transient expected post-operative weakness associated with the spinal cord stimulator surgery on or about August 31, 2016. It is more likely than not his current condition is related to his initial injury to his right upper extremity which arose during the course and scope of his employment with McMinnville Tool & Die.

Dr. Yu based this opinion on her discussions with Mr. Ogden, in which he adamantly denied any loss of consciousness.

On cross-examination, Dr. Yu testified she discussed the risks of spinal cord stimulator surgery with Mr. Ogden before she performed the operation. Specifically, Mr. Ogden should have been aware that the surgery could result in postoperative weakness in his legs that, coupled with his heart condition, could put him at greater risk of falling. Further, the implant in his neck could cause further damage if he were to fall. Dr. Yu agreed with counsel's statement that Mr. Ogden should have "taken appropriate precautions of maneuvering from one place to another especially as it pertains to steps" and that, if he failed to do so, "it was either imprudent, ill-advised or a neglect aspect." She further explained that this was "because we had also told him well before surgery that [he] really should get – pay more attention to [his] heart care."

---

[2] Vanderbilt's emergency department records also mentioned syncope or loss of consciousness. However, the parties stipulated during the hearing that the source of that information was Ms. Smith's notes, not Mr. Ogden. Vanderbilt emergency department simply "copied and pasted" its history from the Life Flight records.

*Kimberly Terry, M.D.*

At MTD's request to GENEX Services, Inc., Dr. Kimberly Terry performed a Physician Advisor Review of some of Mr. Ogden's medical records from August 31, 2016, through October 4, 2016. She concluded Mr. Ogden's paralysis was the result of a syncopal episode that was more likely than not "due to [his] underlying heart disease."

**Findings of Fact and Conclusions of Law**

The following legal principles govern this case. Mr. Ogden has the burden of proof on all essential elements of his claim. *Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2017) ("[T]he employee shall bear the burden of proving each and every element of the claim by a preponderance of the evidence.").

The Appeals Board discussed subsequent injuries in *Lee v. W. Plastics*, 2016 TN Wrk. Comp. App. Bd. LEXIS 53, at *6-7 (Oct. 20, 2016):

> In Tennessee, the general rule is that a "subsequent injury, whether in the form of an aggravation of the original injury or a new and distinct injury, is compensable if it is the 'direct and natural result' of a compensable injury." *Anderson v. Westfield Grp.*, 259 S.W.3d 690, 696 (Tenn. 2008). "The rule, commonly referred to as the direct and natural consequences rule, has been stated as: [w]hen the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment." *Id.* Therefore, "all the medical consequences and sequelae that flow from the primary injury are compensable." *Rogers v. Shaw*, 813 S.W.2d 397, 400 (Tenn. 1991). "The rationale for the rule is that the original compensable injury is deemed the cause of the damage flowing from the subsequent injury-producing event." *Anderson*, 259 S.W.3d at 697.

Mr. Ogden asserted he is entitled to permanent total disability (PTD) benefits for the injuries he suffered in his fall on October 1, 2016. He contended this fall was the result of weakness in his leg caused by the recent insertion of the spinal cord stimulator. Therefore, his paralysis is a direct and natural consequence of the original, compensable injury.

MTD countered that Mr. Ogden is not entitled to PTD benefits because his fall was not a natural progression of his original injury or its treatment. First, it argued Mr. Ogden fell because he fainted or lost consciousness. Mr. Ogden's paralysis is, therefore, unrelated to his work accident because the most likely cause of this syncopal episode was his pre-existing heart condition. MTD also contended Mr. Ogden's use of the stairs was negligent. This negligence constituted an independent, intervening cause that broke the chain of causation between his work injury and his subsequent paralysis.

*Loss of Consciousness*

The medical records are somewhat contradictory as to whether Mr. Ogden fell because he lost consciousness. Ms. Smith, the flight nurse, noted that he suffered two syncopal episodes "in which he fell down a set of stairs." The history at Unity Medical Center characterized the incident as a "slip and fall" and noted Mr. Ogden had no CT scan of his head "because he had no LOC." His cardiology consult notes taken at Vanderbilt the day after his fall state, "At no time did he lose consciousness or have presyncope."

Medical records and the histories they contain are rarely perfect, and it can be difficult to resolve conflicting records. Ms. Smith's records were detailed and professional, but they were not faultless. For instance, she noted that Mr. Ogden fell down a flight of stairs, which is not accurate, as the parties agreed that he was on the bottom of three steps when he fell. Some of her notations of the medications he received at Unity were also incorrect. Ms. Smith also noted Mr. Ogden had received Hydromorphone at Unity and agreed it could have affected his responsiveness. Presumably, her notation of syncope could be a documentation error or a miscommunication from Mr. Ogden caused by his medications or stress. This seems especially likely in view of the fact that neither the EMTs nor the first emergency room documented any loss of consciousness.

Perhaps more importantly, Mr. Ogden's own testimony is persuasive. He consistently and convincingly testified that he never lost consciousness. Although the Court could not observe Mr. Ogden while he testified by telephone, it listened carefully to his testimony and found him steady, forthcoming, reasonable, and honest, which characteristics, according to the Tennessee Supreme Court, are indicia of reliability. *See Kelly v. Kelly,* 445 S.W.3d 685, 694-695 (Tenn. 2014). On the whole, the evidence fails to support MTD's claim that Mr. Ogden fell because of a loss of consciousness.[3]

---

[3] MTD contended Mr. Ogden's heart condition caused him to pass out, and it submitted numerous medical records establishing his history of coronary heart disease and quadruple bypass surgery. In view of the Court's determination that Mr. Ogden did not fall because of a loss of consciousness, it will not summarize or discuss those records.

*Independent Intervening Cause*

"However firmly implanted the principle may be that a subsequent injury is deemed to arise out of the employment if it flows from a compensable injury, the rule has a limit. That limit hinges on whether the subsequent injury is the result of independent intervening causes, such as the employee's own conduct." *Bolden v. Lowe's Home Centers, Inc.*, 2017 TN Wrk. Comp. App. Bd., LEXIS 28 at *7-8 (Apr. 21, 2017) (citing *Anderson*, 259 S.W.3d at 697). In order for an employee's actions to constitute an independent, intervening incident sufficient to break the chain of causation, there must be negligent, reckless, or intentional conduct on the part of the employee. For purposes of the intervening cause principle, an employee acts negligently when he fails to exercise reasonable care under the circumstances. *Id.*

MTD contended Mr. Ogden should not have been using the stairs alone or without the use of the handrail. It cited Dr. Yu's testimony that Mr. Ogden should have been aware of the possibility of postoperative weakness in his legs and should have "taken appropriate precautions of maneuvering from one place to another especially as it pertains to steps." MTD relied on Dr. Yu's agreement with its attorney that, if Mr. Ogden failed to take these appropriate precautions, "it was either imprudent, ill-advised or a neglect aspect."

MTD's reliance on this testimony overlooks the fact that Dr. Yu went on to say that Mr. Ogden's failure to take these precautions was imprudent "because we had also told him well before surgery that [he] really should get – pay more attention to [his] heart care." This raises the question of whether Dr. Yu's real concern was postoperative weakness or whether it was the possibility of a fall caused by other issues arising from Mr. Ogden's cardiac problems. Further, Dr. Yu testified that Mr. Ogden was supposed to be active and walk at the time of his fall in order to avoid muscle atrophy. She said he had no specific instructions about using or not using stairs because "we do have to leave some things to people's common sense."

A review of the cases the parties cited shows there is no bright-line test, and this issue is dependent on the facts of each case. MTD primarily relied on *Bolden*. Mr. Bolden suffered an aggravation of his compensable ankle injury while "pushing off" from rock to rock as he crossed a stream on a hike. The Appeals Board agreed with the trial court's finding that Mr. Bolden's need for additional treatment was not a direct and natural consequence of his work injury. The Board noted his activities did not violate any medical restrictions but found that he "nonetheless voluntarily engaged in non-work-related physical activities that presented a *substantial risk* to his healing left ankle." *Id.* (Emphasis added.)

The case of *Carpenter v. Lear-Siegler Seating Corp.*, No. 03501-9201-CV-5, 1993 Tenn. LEXIS 67 (Tenn. 1993) yielded a different result. Ms. Carpenter fell down some

stairs because of an unpredictable sudden numbness to her left leg that had occurred periodically since sustaining her back injury several months earlier. The Supreme Court upheld the trial court's finding that Ms. Carpenter's stairway fall and the resulting injuries were the natural and proximate consequence of the prior back injury.

*Carpenter* is more closely analogous to Mr. Ogden's situation. He was not engaged in some sort of unusual or strenuous activity but was merely moving about his home. This is distinguishable from *Bolden*, where the Board found the employee's actions constituted a *substantial* risk to his healing ankle. The inquiry then, is not whether Mr. Ogden's use of the steps constituted any risk at all, but whether it was a substantial risk. Admittedly, Mr. Ogden had already had some instances of problems with his leg, but so had the employee in *Carpenter*. The primary difference between the two situations was the timing of the fall. Ms. Carpenter's fall occurred several months after her underlying injury, while Mr. Ogden fell one month after his surgery. The question then, is whether it was unreasonable for Mr. Ogden to navigate the stairs into his garage at that time.[4]

The Court finds that Mr. Ogden's actions did not constitute negligent, reckless, or intentional conduct. He was under no specific medical restrictions barring him from using the steps, but instead his medical providers encouraged him to walk and be as active as possible. In other words, Mr. Ogden was to use his best judgment as to which activities he felt he could perform safely and comfortably. He felt that going to the garage to retrieve his phone was reasonable, based on his mobility at the time of the accident, the fact that he had safely navigated the steps several times per day for several weeks since his surgery, and the somewhat pressing need to get the phone to call Ms. Gibson for help. Although using the steps presented some obvious risk, especially when Mr. Ogden could not use the railing, the Court cannot find that risk was unreasonable under the circumstances or that he was negligent in the way he evaluated the situation.

Even if the Court found Mr. Ogden's use of the steps negligent, that negligence would not necessarily constitute an independent, intervening cause of his injuries. That finding would require evidence that using the steps caused Mr. Ogden's fall or caused additional injuries.

MTD submitted no evidence that the steps caused Mr. Ogden to fall. Instead, other than the loss-of-consciousness argument, the only evidence regarding the cause of the accident is Mr. Ogden's testimony that he fell because his leg gave way. This was the result of postoperative weakness, not his use of the steps, as evidenced by the fact that Mr. Ogden's leg gave way on other occasions.

---

[4] Dr. Yu's testimony regarding what Mr. Ogden knew about the possibility of postoperative weakness in his legs is relevant to this inquiry. However, to the extent her testimony about whether his actions were "imprudent, ill-advised or a neglect aspect" may constitute a legal opinion on the question of negligence, the Court finds no foundation to suggest she is qualified to make that determination.

Regarding the mechanism of Mr. Ogden's injuries, the Court notes that, unlike the employee in *Carpenter*, Mr. Ogden did not fall down a flight of stairs. He did not even fall off the steps he was using. Instead, he was on the last step before reaching the floor when his leg gave way. When Mr. Ogden fell, he landed on the step on his buttocks, and his head hit the wall next to the steps. No evidence suggests that the location of the fall actually caused the injury to Mr. Ogden's neck. Would the same injury have occurred if he had fallen after reaching the garage floor or if he had fallen against the washing machine in the hallway again? The Court cannot simply assume a causal connection between the injury and falling on the bottom step.

Without any proof the steps caused Mr. Ogden's leg to buckle or caused additional injuries in his fall, the Court cannot find his use of the steps to be an intervening cause of his injuries. Instead, it must credit Dr. Yu's opinion that, "his falls of October 1, 2016, resulted from the transient expected post-operative weakness associated with the spinal cord stimulator surgery on or about August 31, 2016."[5] This conclusion is supported by other proof, such as prior complaints of leg weakness, the request for a cane, and credible testimony from Mr. Ogden and Ms. Gibson.

For these reasons, the Court finds that Mr. Odgen met his burden of proving that his fall of October 1 was a direct and natural consequence of his original, compensable injury. Thus, the injuries Mr. Ogden suffered in that fall arose primarily out of his employment with MTD.

Per the parties' stipulation, this finding means that Mr. Ogden is permanently and totally disabled under the Workers' Compensation Law. He is, therefore, entitled to weekly benefits from July 15, 2017, the day after MMI,[6] "until [he] is, by age, eligible for full benefits in the Old Age Insurance Benefit Program under the Social Security Act." *See* Tenn. Code Ann. § 50-6-207(4)(A)(i).

Before the Court can award an attorney fee in excess of $10,000.00, Tennessee Code Annotated section 50-6-226(a)(2)(C) requires specific findings of the factors in Tennessee Supreme Court Rule 8, Rule of Professional Conduct 1.5, which include:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

---

[5] The Court finds Dr. Terry's contrary opinion unpersuasive because she based it on the assumption that Mr. Ogden suffered a syncopal episode.

[6] "Permanent disability benefits, whether total or partial, begin accruing on the date that the employee attains maximum medical improvement." *Smith v. U.S. Pipe & Foundry Co.*, 14 S.W.3d 739, 745 (Tenn. 2000).

9

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) whether the fee agreement is in writing.

The Court finds this case required significant time and expertise on the part of Mr. Ogden's counsel. A fee of twenty percent is both statutorily-authorized and customary in cases brought before this Court. Further, the amount is appropriate for successfully shepherding a complicated case through litigation, including detailed medical proof, as well as successfully negotiating temporary resumption of benefits after MTD denied the claim. All the applicable factors, including the experience and ability of Mr. Ogden's attorney, militate in favor of the requested fee. Therefore, under Tennessee Code Annotated section 50-6-207(4)(A)(ii)(a) and section 50-6-207(4)(A)(iii), the Court commutes twenty percent of the first 450 weeks of permanent total disability benefits, or $26,172.00, for Mr. Ogden's attorney's fee.

Additionally, Tennessee Code Annotated section 50-6-207(4)(A)(ii)(c) provides:

After the total amount of the commuted lump sum is determined, the amount of the weekly disability benefit shall be recalculated to distribute the total remaining permanent total benefits in equal weekly installments beginning with the date of entry of the order and terminating on the date the employee's disability benefits terminate pursuant to subdivision (4)(A)(i).

Mr. Ogden will be eligible for full benefits in the Old Age Insurance Benefit Program on February 8, 2038. The period of July 14, 2017, to February 8, 2038, totals 1,073.43 weeks, which at the agreed compensation rate of $290.80 would total PTD benefits of $312,153.44. Reducing that amount by the attorney fee of $26,172.00 yields an adjusted total benefit of $285,981.44, which divided by 1,073.43 weeks equals an adjusted weekly compensation rate of $266.42. MTD shall pay Mr. Ogden's PTD disability benefits at this rate.

**IT IS, THEREFORE, ORDERED** as follows:

1. MTD shall fulfill its statutory obligations for the provision of medical benefits in Tennessee Code Annotated section 50-6-204. This includes payment of any past medical expenses that are causally-related to the February 13, 2015, and October 1, 2016 injuries. Mr. Ogden or the medical providers shall furnish medical bills to MTD or its workers' compensation carrier.

2. MTD shall continue to provide Mr. Ogden with medical treatment made reasonably necessary by the February 13, 2015, and October 1, 2016 injuries in accordance with Tennessee Code Annotated section 50-6-204.

3. MTD shall pay Mr. Ogden permanent total disability benefits at the rate of $266.42 per week until he is eligible for full benefits under the Social Security Old Age Insurance Benefit Program.

4. MTD shall pay Mr. Ogden a lump sum of $26,172.00, which his attorney is entitled to recover as a fee of twenty percent of his first 450 weeks of permanent total disability.

5. Costs of $150.00 are assessed against MTD under Tennessee Compilation Rules and Regulations 0800-02-21-.07, to be paid within five days of this Order becoming final. Absent an appeal of this order, the order shall become final thirty days after issuance.

6. MTD shall prepare and file a statistical data form within ten business days of the date of this Order, pursuant to Tennessee Code Annotated section 50-6-244.

**ENTERED THE 21ˢᵗ OF NOVEMBER, 2017**

_____

**Judge Dale Tipps**
**Court of Workers' Compensation Claims**

11

# APPENDIX

Exhibits:

1. Indexed Medical Records
2. Transcript of Dr. Hung Yu's deposition
3. Transcript of Shawn Ogden's deposition
4. Photograph of surgical scar
5. Written statement of Shawn Ogden
6. Photographs of garage steps
7. Photograph of Shawn Ogden

Technical Record:

1. Petition for Benefit Determination
2. Post-Discovery Dispute Certification Notice
3. Parties' Exhibit and Witness Lists
4. Parties' Pre-Compensation Hearing Statement
5. Parties' Pretrial and Supplemental Briefs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Order was sent to the following recipients by the following methods of service on the 21st day of November, 2017.

| Name | Certified Mail | Via Email | Service sent to: |
|------|------|------|------|
| **John Drake** | | X | John.attorneymurfreesboro@gmail.com |
| **Brett Burrow** | | X | bburrow@burrowlee.com |

_____
**PENNY SHRUM, COURT CLERK**
wc.courtclerk@tn.gov